On the Merits.
The plaintiffs are J. P. Blanks, J. G. W. Yowell, R. W. Martin, and W. D. Chew. The defendants are W. I-I. Lephiew, Mrs. Lessie Lephiew, and G. E. Singleton. All are residents of the state of Arkansas.
The plaintiffs had an option from the Summit Lumber Company on certain cypress timber standing- upon lands situated partly in this state and partly in Arkansas. Finding an opportunity to dispose of this option at a dollar profit per thousand feet to the defendants Lephiew, they closed it, and entered with the Lephiews into a written contract reciting that they sold this timber, as well as some other timber owned by one of them, W. D. Chew, to the Lephiews at the price of $3.50 per thousand feet, payable in money, the quantity of the timber to be estimated by experts to be named by the parties; and reciting, further, that the Lephiews should establish a shingle mill on the land for manufacturing said timber into shingles, and should cut, and pay for, at least $8,000 worth of timber within 12 months, and should thereafter continue to cut and manufacture and make payments at the rate of at least $1,000 a month until the total price, according to the estimate of the experts, should have been paid, when the plaintiffs should make a deed to the timber, in favor of the Lephiews, allowing them 10 years within which to remove same, the said $8,000 to be payable as follows: $1,000, June 20, 1907; $1,000, July 20, 1907; $1,000, August 20, 1907; and $5,000, September 5, 1907 — and reciting, further, that the Lephiews should execute a satisfactory bond to secure their obligation to establish the shingle mill and make the first year’s payment of $8,000, and that the contract should take effect only when this bond should have been executed and approved; and reciting, further, that should the Lephiews fail for two consecutive months to pay for the timber as cut, as specified in the contract, then the plaintiffs should have the right to declare further operations under the contract suspended until such arrearage should have been paid; that in the event, from any cause, the mill should remain idle, and monthly payments be unpaid, for 6 consecutive months, the entire contract should become null and void, and all improvements put upon the land be forfeited to the plaintiffs, and the sum of $8,000 be due and payable to the plaintiffs, and the payment be secured by the bond; and reciting that, should the Lephiews decide that the mill could not be operated at a profit, they might, if they so desired, after they had paid the $8,000, relieve themselves of all further liability under the contract, except for the timber already cut or deadened, by paying to plaintiffs $500.
This contract was subsequently modified, so that the quantity of the timber, instead of being estimated by experts, should be ascertained by the number of shingles made out of it, every eight shingles to count for one foot of timber, and that monthly statements, showing the number of shingles manufactured, should be furnished to the plaintiffs.
A bond for $8,000 was executed, with the defendant Singleton as one of the sureties on it. The mill began to operate on the 20th of June, 1906; but it did not run reg *550 ularly every day, but would be idle for weeks at a time. It finally stopped in June, 1908, for the reason that it bad used up all tbe timber near enough to it to be profitably transported without a tramroad; and also, as we gather, for the reason that the Lephiews had run short of funds with which to operate.
They had then paid only $6,894.99 on the contract, and were therefore nine months in arrears on the balance of the $8,000 due September 5, 1907, and were in arrears on the $1,000 payments due monthly from and after October 6, 1907, and plaintiffs through J. P. Blanks, who had in the entire matter" acted as trustee for his associates, began to be pressing for payment. The defendants then executed the following note:
“Dermott, Ark., Aug. 6th, 1908.
“On or before September 1st, 1908, after date, we, or either of us, promise to pay to the order of J. P. Blanks, trustee or his assignee, at office of Hamburg Bank, Hamburg, Ark., the sum of nineteen thousand five hundred and no/100 dollars ($19,500.00) for value received with eight (8%) per cent, interest per annum fi'om July 1st, 1908, until paid. This note is given for the cypress timbers located on land as described in record 20 page 364^65 Farmer-ville, La., Union Parish, in deed from the Summit Lumber Co. to J. P. Blanks, trustee, also in deed in record 21 page 1 and 2 Eldorado, Ark., Union Co. Heed from Summit Lumber-Co. to J. P. Blanks, trustee, also in deed record book 14, page 116, Eldorado, Ark., Union Co. Heed from T. O. Terrell to J. P. Blanks, trustee, and for all cypress timber that is deeded and on record on lands described in Deeds of W. D. Chew & Wife to J. P. Blanks, trustee, recorded in Eldorado, Ark., Union Co. and Farmerville, La., Union Parish, recorded in 1906 and 1907. See record book 18, page 534, and record book 14, page 25, Eldorado, Ark., Union Co. Also all the cypress timber of McCormack and McShane showned by deeds to J. P. Blanks, trustee, this note is executed with an agreement and in justment and settlement of all claims as to the estimate of timber, and all claims of either parties ceases as to the estimate, or the amount of timber. It is by all parties agreed in this note that J. P. Blanks retain a lien on all this timber for above purchase price and he does not in any way release ownership of this timber until this note paid, when paid he releases all claim, as above stated. For value received we witness our hands and seal.
“W. H. Lephiew.
“C. E Singleton.
“Lessie F. Lephiew.”
The defendant Singleton, who signed this note with the other defendants, was the bookkeeper of the defendant W. I-I. Lephiew, and was the surety on the $8,000 bond given under the contract.
It may be well to mention that the deeds from T. R. Terrel and McCormack and McShane mentioned in this note were to tracts of timber purchased by plaintiffs subsequent to the contract, and which, by operation of one of the clauses of the contract, were included in the contract. It may be well to mention, also, that in making the purchase of this additional timber the plaintiffs had been represented by the defendant W. H. Lephiew; so that the latter was fully informed as to what was the quantity of this additional timber.
At or about or shortly after the date of this note (as far as we can fix time from the record) the plaintiffs agreed to assist the defendants in installing a tramroad, and did advance to them $4,000, for which they took their note, dated March, 1909.
The defendants resumed operations; but seem, to have run short of funds with which to meet the expenses of installing the tram, and at the same time running the mill; and, in order to facilitate them in obtaining credit with the local bank, plaintiffs gave them a letter waiving in favor of whoever should make them advances their priority of lien upon the timber and the shingle mill; and agreeing, as we gather (the letter is not in evidence, and its exact contents are not proved), not to press their claim against defendants to the prejudice of such advances.
In January, 1910, the defendants paid $1,500 on the $4,000, but, they not having paid anything on the above-transcribed note, the plaintiff Blanks began to insist upon something being paid; and, finally, in June, 1910, placed the note for collection in the hands of his Arkansas attorney, Mr. Poe.
Mr. Poe met with no better success than Blanks in his efforts to collect the note. We *552 gather that the Lephiews could not find a market for their shingles, and were unable to operate their mill for lack of funds, for we find that in August and September, 1910, Blanks, for himself and his associates, was offering to furnish the money for operating the mill, provided ground could be secured for stacking, or storing, the shingles. Letters passed between the parties at this time, in which the Lephiews proposed that the plaintiffs should take the timber and mill off their hands at a price equal to the amount of their debt, plus a cash payment fixed in one letter at $3,500 and in another at $4,000.
Nothing came of these propositions. In November, 1910, Mr. Poe and Mr. Blanks went to the mill to see about having shingles shipped to plaintiffs in part payment. They obtained a promise.of shipment, and four car loads were accordingly shipped, which were sold for $2,000. In January, 1911, the Lephiews declining to make shipments, and intimating that they would take advantage of that clause of the contract which gave them the privilege of retiring from the contract on payment of $500, the present suits were brought.
One of them, the first that was filed, is accompanied by a sequestration of the timber sold and of the shingles manufactured out of it. It is based upon the above-transcribed note. The second is accompanied by attachment of same property and also of the mill. It was filed the day after the filing of the first, and is based upon the same demand, and also upon the balance due on the $4,000 note given for the loan made to enable the Lephiews to install the tramroad. The demand upon the $4,000 note has, however, been discontinued. The defendants were proceeded against as absentees, and a curator ad hoc was appointed to represent them. The two suits were consolidated, and now constitute but one.
[2] The defendant Singleton excepted to the jurisdiction of the court; he being a nonresident and no property of his having been seized. An attempt was made to prove that he was interested with his co defendants in this timber and sawmill business; but this attempt failed.
He, however, made a general appearance in the suit without reserve of his exception, and instituted by way of reconvention a suit in damages, and thereby waived his said exception.
The two other defendants appeared in the suit only through the curator ad hoc. They moved to dissolve the writ of sequestration on the grounds, first, that a writ of sequestration cannot be made to fill the office of a writ of attachment in bringing a nonresident into court by substituted process; and, second, that “there is a misjoinder of parties since the wife, under the laws of this state, cannot be sued in a personal action for which the husband is wholly liable.”
This motion is not now being pressed, and need not be further considered. And the same may be said of an exception of lis pen-dens, and of a motion to dissolve, filed by the defendants in the attachment suit.
The defendants filed a joint answer in the sequestration suit; the Lephiews appearing through the curator ad hoc. They denied that the note sued on was due; they said that this note was not intended to represent an actual debt, but was executed merely to be used by Blanks as a collateral for obtaining money for the Lephiews, to be used by them in their timber business; they denied that the timber contract was a sale, or even had the effect of creating a debt on the part of the Lephiews for any fixed price; and they prayed for the dissolution of the sequestration, and for $12,500 damages.
[3] We think'the timber contract was a sale, and did have the effect of making the Lephiews liable for the price. There was a thing, namely, the timber; a fixed price, namely, $3.50 per thousand feet of timber; and a consent. True, the original contract, *554 which had left the appointment of the ex'perts to the parties themselves, had no binding force, since either party might have declined to appoint an expert, and thereby nullified it (Werner Sawmill Co. v. O’Shee. 111 La. 817, 35 South. 919); but the supplemental contract, by which the quantity of the timber was to be determined by the number of shingles, did away with all uncertainty. The fact that the Lephiews were allowed the l>rivilege of retiring from the contract after the $8,000' should have been paid, upon payment of $500 additional, did not deprive the contract of its binding character as a sale. It was a sale to which was attached a resolutory condition. C. C. arts. 2045, 2035, 2036. The resolutory condition does not suspend the contract; or, in other words, prevent 'it from having full effect.
[4] On the question of whether the above-transcribed note was intended to be a real, binding obligation, or merely to serve as collateral to borrow money on for the use of the Lephiews, the testimony is conflicting. Blanks testifies that he went to Dermott, Ark., where the Lephiews lived, and W. H. Lephiew kept store, with the intention of having a settlement of some kind of this timber business; that the train reached Dermott at 2 o’clock in the afternoon, and he went at once to Lephiew’s store; that Lephiew was not in, but soon came in; that Lephiew consented readily to giving the note, but that the fixing of the amount for which it should be given took a great deal of time ; that they figured on it all that afternoon and evening, and the next morning, and finally agreed upon the amount of $19,500, for which the note was given after he had consented to make a reduction. He produces some sheets of paper upon which part of this figuring was done. The figuring was based upon the same estimates upon which plaintiffs had bought the timber, and upon the payments that had been made by the Lephiews, with computation of interest pro and eon.
W. H. Lephiew testifies that the note was executed at the suggestion of Blanks, to be used by him as collateral in borrowing money for the continued operation of the shingle mill; and Singleton testifies that he signed the note upon the representation of Blanks that it should never be used for any other purpose, and that payment of it should never be required; that he would always protect it — a thing which Singleton well knew he would always easily be able to do.
Two of the other plaintiffs, Martin & Yo-well, testify that it was thoroughly understood that the note was given in full settlement, and that W. I-I. Lephiew repeatedly so admitted in conversation with them.
Mr. Poe, the attorney in whose hands the note was placed for collection, says that the first time he presented the note for payment Lephiew did not deny its validity, but merely said it could not be collected, meaning, as the witness understood, that he was not in a position to make any payment on it, but that the second time he called at Lephiew’s place of business to press payment of the note Lephiew took the same position which he now occupies with reference to the note not having been intended to be a binding obligation. However, that when he and Blanks went to the shingle mill of defendants determined to obtain payment, or else to take legal proceedings, Lephiew expressly admitted the validity of the note, and promised to make shipments of shingles in pay-, ment, and that these shipments were made, and realized $2,000. Prom the fact that it was in June, 1910, that the note was placed in the hands of Mr. Poe for collection, we infer that it was about that date he called on Lephiew the first time. Nothing in the record enables us to fix, even approximately, the date of the second presentation for payment; hence, we do not know whether it was before or after the date of a letter written by Lephiew to Blanks on September 2, 1910, in the course of the correspondence *556 hereinabove referred to, when there was some question of Blanks furnishing the Lephiews money for running the mill, and W. H. Lephiew was proposing that Blanks and his associates should take over the mill on paying him $3,500 or $4,000 and releasing him from the timber contract.
We have concluded that the truth in the matter lies with plaintiffs. In the first place, the witnesses stand four to two. In the next place, the defendants have to overcome the prima facie showing made by the fact itself of the note having been given. Then, the situation of the parties called for something to be done. The Lephiews had failed deplorably to meet the payments under their contract, and the least they could do in default of ability to pay was to give a note. Finally, while in his letter of September 2, 1910, Lephiew takes the same ground as now in this suit as to this note not having been intended to be a binding obligation, his main complaint would seem to have been, not relative to the amount of the note, but to the interest it was bearing.
To this apparently conclusive case which plaintiffs have made out the defendants W. H. Lephiew and Singleton oppose their own testimony and certain expressions made use of by Blanks in his letter written at the time the note was executed, and the improbability that the Lephiews would have consented to incur an obligation to pay so large a sum within 24 days when they were without even the means of operating their mill; and the improbability that they would have consented to begin at once paying 8 per cent, interest on a debt which they had 10 years to pay without interest. And they rely greatly upon the statement made by Blanks, in answer to the question:
“How did you expect to use that note? A. I wanted that mill, and Martin and Yokeam and myself agreed that we would take it awa-y from Lephiew if we couldn’t agree what we were going to get out of it.”
The contention is that this statement is a bit of truth that slipped out of the lips of Blanks in an unguarded moment, which lets the cat out of the bag, revealing a deep-laid plan on the part of Blanks to secure this note on the false pretense of its being needed as a collateral, whereas the secret object was to use it for ousting the Lephiews from the mill property.
As we understand this statement of Blanks, it means that the plaintiffs were unwilling to let matters go on dragging as theretofore (the Lephiews not carrying out the contract, and the amount of their debt so uncertain as not to be available for bank purposes), and were determined to take the mill, if no other course was open to them. The sinister motive imputed to Blanks accords little with his conduct in not only not carrying out this deep-laid, nefarious plan, but, on the contrary, lending at that same time $4,000 to Lephiew to enable him to install a tramroad for operating the mill.
It accords little, also, with the friendly relations then existing between the parties, or with the disposition of Blanks at all times to assist Lephiew, as is manifested by his conduct. In the latter part of 1910 we find him considering a proposition that he undertake to finance the mill regularly, and, far from coveting the ownership of the mill at that time, we find him seeking to put an end to the repeated offers of Lephiew that he take over the mill by the emphatic statement:
“You will please remember that I don’t want to buy the shingle mill, and will not buy it at all.”
More significance would have to be attached to Blank’s statements in his letters, if they were not explained; but they are.
The note was executed on August 8, 1908. Blanks in his letter of July 11, 1908, says:
“I don’t see any way at present that we will be able to get any money as we have got to borrow some money to pay the Trust Co, *558 the balancé on the timber that came due Aug. 1st. I saw them yesterday and. they will not extend the paper for us.”
In his letter of July 28, 1908, he says:
“After writing you yesterday I went to Pine Bluff to see the Bluff City Lbr. Co. about the shingle contract. They are willing to buy the out-put of the mill for six months, based on 60 to 75 cars, to be paid for each month as cut. I don’t know about contracting whether this would be any advantage to you to sell them the shingles. You know it doesn’t relieve the present condition, although I find I can use the contract. I came home this morning thinking Boy Martin would be here and we could arrive at some positive decision about getting the money for you.”
In his letter of August 3, 1908, he says:
“I will be in Dermott within the next few days — probably Wednesday or Thursday. Our arrangements are favorable. I am somewhat inclined to think that I will /be able personally to help you raise some of the money. Will explain it when I come down.”
He went to Dermott, as he here promised to do, and the note was executed.
Blanks was not questioned relative to the letter of July 11, 1908, and there is nothing to show what it had reference to. It might be understood as meaning that he and his associates would not be able to borrow money for Lephiew.
The other two letters are explained by Blanks, as follows:
“Q. When you were on the stand’ under cross-examination, you were questioned about a letter marked ‘Defendant Singleton A,’ dated July 28, 1908, in that letter I notice you stated that you went to Pine Bluff to see the Bluff City Lumber Company about the Shingle contract; what shingle contract does that refer to?
“A. A few days before this letter was written, I was in Dermott, and Mr. Lephiew told me that he wanted to sell his shingles, that he wanted to contract, and that there was a possibility of him contracting them to the Bluff City Lumber Company; he asked me if I had any objection of seeing Mr. Butherford, the president of the Bluff City Lumber Company, and find out from him the nature of the contract in which they could enter into; I told Mr. Lephiew I had to go to Moscow and from there to Pine Bluff, and I passed right by the office of Mr. Butherford and I would deliver the message to him, and then write him. So I saw Mr. Butherford, and this letter is in reference to the contract in which Lephiew was wanting to make with the Bluff City Lumber Company to sell the output of that mill.
“Q. I notice in one place in the same letter you state that, ‘It doesn’t relieve the present condition’; what condition did you then refer to?
“A. The Bluff City Lumber Company would not pay any money on the stuff that wasn’t made.
“Q. What was the condition then that you meant wouldn’t be relieved?
“A. The conditions were that Mr. Lephiew owed me some money, and I was wanting the money, and I couldn’t get anything out of that proposition until they realized it out of the shingles, and that didn’t relieve the present condition.
“Q. You further say that you find you can use the contract; in what way did you mean that you could use the contract?
“A. I found from talking to Mr. Martin and Mr. Yokeam that if he would get this contract with the Bluff City Lumber Company that they had good rating, and that they would be willing to let the mill start up and rely on getting the money for the timber out of this contract.
“Q. What action had you advised Mr. Lephiew you were about to take towards forcing payment of his indebtedness?
“A. Unless he paid on this shingle account, we would bring, suit against him for the amount he owed.
“Q. You were also questioned about a document marked ‘Defendant Singleton B,’ being a letter dated August 3, 1908, one sentence in there reads, ‘Our arrangements are favorable,’ what arrangements do you refer to?
“A. In connection with the same Pine Bluff letter, the part of getting my partner and Martin to wait on the Lephiew mill, and take the Lephiew contract to the shingles use that contract to get the money out of that what they owed us.
“Q. You stated further in that letter that you are somewhat inclined to think that you will be able personally to help Lephiew raise some money; what help do you have reference to?
“A. I have reference to the amount he owed me, and my partners, that I could personally help him satisfy them, if we couldn’t satisfy them I knew Butherford well enough, that I would be willing to help Lephiew out on that.”
We have no reason for doubting the sincerity of these explanations. The defendant Lephiew might have contradicted them if they had not been true; but he did not do so.
There would be some force in the unlikelihood of the Lephiews agreeing to pay so large a sum of money within so short a *560 time, when, as the evidence shows, it could not possibly have been within the contemplation of the parties that they should do so, if it were not that, as already stated, the situation was such that a note had to be given, and if it were not that the time when the note should mature was of little significance, since the makers would be no better able to meet it in one year than in one month; they depending upon the operation of the mill to pay it. It should really have Been made payable on demand, since a lien was retained on the timber to secure it, and the contemplation of the parties was that the proceeds of the shingles as manufactured and sold should be attributed towards the gradual payment of it. Had a long maturity been given to it, the Lephiews might on the principle of qui doit a terme ne doit pas (he who has a term for payment is not presently a debtor) have claimed the right to go on and make and sell the shingles without having to make any payment on the note until its maturity.
There would also be some force in the unlikelihood of the Lephiews agreeing to pay 8 per cent, interest on a debt which was not to mature and become interest bearing for yet 10 years, but it is not true that the debt In question was not to mature and be interest bearing before the expiration of 10 years. Under the terms of the contract, the Lephiews were to pay at least $8,000 the first year, and at least $1,000 per month thereafter. This made the entire debt of say $26,000 mature in 30 months from the date of the contract which was September 10, 1906; and 23 months had already expired at the date the note was given, August 8, 1908. So that the greater part of the debt was not only due, but was past due, and, what was worse, the plaintiffs were no longer willing that the business should continue in the shape in which it was, and were insisting upon something being done to put it in a more definite and bankable shape.
[5] As already stated, Lephiew, when Blanks and Poe called at the mill to insist upon the note being paid, agreed to make immediately some shipments of shingles in part payment of the note, and did accordingly forward four car loads. Across the invoice of each of these shipments he wrote:
“Please credit my timber contract.”
Defendants contend that the effect of the plaintiffs consenting to receive these shipments with these words written across the face of the invoices was to do away with the note; or, as it is put in the brief:
“The plaintiffs, having accepted payments under the original contract, which was the basis of the settlement between plaintiffs and defendant Leohiew, and the execution of the note which they claim set aside the contract, are now estopped both in law and equity from proceeding against the defendants on the note relied on herein.”
We can discover no such magic in the legend in question. The request to credit to the timber contract was not necessarily a repudiation of the note or an expression of unwillingness that the credit should go to the note; did not necessarily exclude the note which had been given for the purpose of fixing the amount due under the timber contract, and, as such, formed part of it, and was secured by lien on the timber. These shipments were being made in fulfillment of a positive and distinct agreement and promise, and this legend did not necessarily have to be understood in the sense that Lephiew was repudiating this agreement and promise and harking back to the contention that the note was not a binding obligation; and nothing shows that it was so understood.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that the plaintiffs J. P. Blanks, J. G. W. Yowell, R. W. Martin, and W. D. *562 Chew have judgment against the defendants W. H. Lephiew, Mrs. Lessie Lephiew, and C. E. Singleton, in solido, in the sum of $17,-500, with 8 per cent, per annum interest thereon from the 1st day of September, 1909, and the costs of this suit; the effects of this judgment, however, to be limited, in so far as the defendants W. H. Lephiew and Mrs. Lessie Lephiew are concerned, to the property seized in this suit; and it is further ordered, adjudged, and decreed that the writs of attachment and sequestration in this suit be maintained, and that the property seized under said writs be seized and sold to satisfy the present judgment, and that the said plaintiffs be and they are hereby recognized to have a vendor’s privilege upon the timber seized herein and upon the shingles manufactured out of the timber sold by the plaintiffs to the defendants W. H. Lephiew and Mrs. Lessie Lephiew, and to have an attaching creditor’s privilege upon all the property attached in this suit. The defendants to. pay all costs.